Samuel COHEN et al., Defendants, Appellants,

v.

COLE NATIONAL CORPORATION, Plaintiff, Appellee.

No. 6196.

United States Court of Appeals First Circuit.

Heard Nov. 6, 1963.

Decided Sept. 2, 1964.

Arthur M. Gilman, Boston, Mass., with whom Walter H. McLaughlin, Boston, Mass., was on brief, for appellants.

Bertram H. Loewenberg, Boston, Mass., with whom Timothy H. Donohue, Stephen A. Hopkins and Sherburne, Powers & Needham, Boston, Mass., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

The so-called "golden car key" is a gold plated automobile key having a monogram on one side of its head and an emblem or advertising message on the other. The keys are sold by manufacturers as blanks, sometimes directly to users but for the most part in quantity to busi-

ness concerns for them to use as gifts to customers for advertising or promotional purposes. The blank keys are cut by the purchasers on key filing machines, sometimes supplied by the manufacturer, to fit the car of the person to whom a key is presented.

The "golden car key", hereinafter sometimes referred to as a key, was originally developed in 1952 or 1953 by an Ohio corporation in the advertising specialty business which later merged with another Ohio corporation, the plaintiff, Cole National Corporation, and thereafter operated as Cole National's Elnar Division. In January or February 1959 a principal officer of Elnar, one Kapstein, entered into an agreement with the defendants, Cohen and Sulkin, citizens of Massachusetts, who a short time before had organized a partnership called Allied Associates. For convenience we shall hereinafter refer to the parties as Elnar and Allied. Under the terms of this agreement Allied was to be the sole representative for the sale of Elnar's keys in New England with the exception of two existing distributors. Allied was free to sell keys outside New England but, in order to avoid conflicts with other distributors, only after clearing such sales with Elnar. Elnar sold keys to Allied for less than it sold its keys to others and allowed Allied to sell keys under its own name and to fix its own resale price. The evidence is conflicting as to whether Allied was to have the status of a "distributor" of Elnar's keys and also as to whether it was to buy all its keys from Elnar. Allied forwarded its orders to Elnar and Elnar filled them by sending keys to Allied's customers in envelopes marked with Allied's name and mark. Beginning in March, 1959, Allied with Elnar's advice and assistance devoted substantial efforts to selling keys to financial institutions at which it was gratifyingly successful.

On November 15, 1959, Elnar notified Allied by letter that effective a month later its price on orders of less than 2500 keys would be increased and that a separate charge would be made for "art work." Allied objected and a conference was held at which it was agreed that the charge for "art work" would be cancelled but the price increase would go into effect. In spite of the price increase Allied was still paying less for keys than Elnar's distributors. Early in 1960 Allied ordered dies for cutting key blanks from Hazelton Chain Co. of Roxbury, Massachusetts, and on June 7, 1960, ordered 45,000 key blanks from Hazelton which were shipped beginning in July of that year. These keys bore the same identifying letters, A, B, C, and D, in the same style of type that Elnar was using and were shipped to customers in the same kind of envelopes that Elnar used. There is a dispute as to whether in some instances Hazelton keys were cut by customers on key filing machines owned and supplied by Elnar.

In July or August, 1960, Kapstein noticed a sharp decline in Allied's orders and at a conference arranged to discuss that matter was told by partner Sulkin that business was bad in the summer but that he expected improvement in the fall. Sulkin admitted that he did not at that time tell Kapstein of Allied's order of keys from Hazelton, and apparently Kapstein's suspicions were not aroused. In November, when Allied's orders had practically ceased, at another conference partner Cohen admitted to Kapstein that Allied had another source of supply, and friendly relations between Elnar and Allied came to an abrupt end. Elnar joined its distributors in battle with Allied, by that time incorporated in Massachusetts as Emblematics, Inc., for the golden car key business, and on December 21, 1960, brought suit against Cohen, Sulkin and Emblematics, whom for convenience we shall continue to refer to as Allied, for breach of contract, alleging that Allied had agreed to purchase keys exclusively from Elnar and charged Allied with unfair competition. Allied answered with a general denial and later filed an amended counterclaim in two counts. In the first count Allied sought triple damages under 15 U.S.C. § 15 for violation of §§ 1 and 2 of the Sherman Act as amended,

15 U.S.C. §§ 1 and 2, and in the second count sought damages for unfair competition. Trial by jury resulted in a verdict for the plaintiff on its complaint and also a verdict for the plaintiff on the defendants' counterclaim. The court entered judgment in accordance with the verdicts and the defendants appealed.

The gist of the plaintiff's action was that it had entered into a manufacturer-distributor relationship with the defendants whereunder it sold keys to the defendants according to an agreement that the latter would purchase and sell the plaintiff's keys exclusively. It sought and recovered damages on the basis that the defendants had broken their agreement by purchasing keys from another source. The defendants rested their defense on the proposition that the relationship created was not that of manufacturer-distributor but instead that of seller-customer and that, in any event, they had not agreed to buy keys exclusively from the plaintiff.

■■ The verdicts of the jury settled the issues presented by the complaint and answer, for on this appeal the defendants do not challenge the verdict for the plaintiff on its complaint. The defendants' appeal is limited to their counterclaim. It is based exclusively on asserted errors of the trial court in excluding certain evidence offered by them in support of their counterclaim and on asserted errors of the court in its instructions to the jury on the law applicable to their counterclaim. The plaintiff as appellee asserts that the court's rulings on evidence and its instructions to the jury were correct. But it says that we need not concern ourselves with those matters because the trial court ought to have granted its motion for a directed verdict on the counterclaim on the ground that the evidence offered by the defendants was insufficient to warrant a finding for the defendants on either count. We agree with the appellee's second proposition.

We are very doubtful indeed whether "golden car keys" constitute a "relevant market." But however that may be, a careful analysis of the record fails to show any contract, combination in the form of trust or otherwise or conspiracy by Elnar in restraint of trade or commerce among the several states. Nor does the record show any monopoly or attempt to monopolize, or combination or conspiracy by Elnar with any other person to monopolize, any part of the trade or commerce among the several states, if, indeed, golden car keys could possibly be monopolized. Witness Allied's purchase of keys from Hazelton. The most that we can find in the record appendices is evidence of vigorous, at times sharp, competition between Elnar's distributors backed by Elnar and Allied. At times the participants fought over the same customer, and on one occasion Kapstein wrote to one of Elnar's distributors saying that the news of Sam Cohen in the hospital "is not my desire as I just want to put him out of business." But evidence that Kapstein acting for Elnar put his wish into effect by unfair competitive means is lacking. It is true that after the break in relations between Elnar and Allied in November, 1960, Elnar made available to its distributors a list of prospective customers submitted by Allied for clearance by Elnar to avoid conflicts with other distributors. But the evidence shows nothing more than the normal reaction of a former supplier forced to become a competitor by the wrongful breach of its distributor. The attempts by Elnar to compete for the customers who had previously purchased its keys through Allied, and whose business was by the jury's verdict as much its property as that of Allied, do not strike us as improper. The most we can find is evidence of tough but not unfair competition. The motion to dismiss Allied's counterclaim should have been granted. If there were errors in the exclusion of evidence or in the charge with respect to the counterclaim they are of no consequence.

Judgment will be entered affirming the judgment of the District Court.

ALDRICH, Circuit Judge (dissenting in part).

I agree with respect to Count 1, but not as to Count 2. Whatever the relationship between the parties I find it hard to see how the initially confidential list of Allied's "prospects" on which it had done "missionary work" became Elnar's simply because, as the jury found, Allied broke its admittedly terminable-at-will agreement to buy only Elnar keys. But quite apart from this I cannot consider it proper competition to tell Allied's prospects, or any other person's, that Elnar was the sole producer of golden keys, or that Allied was no longer in a position to supply them. Indeed, it was only because Allied was completely free and able to engage in the key business that it failed on Count 1. The district court did not dismiss Count 2, nor should it have. Since I am in the minority on this, however, I will not deal with the errors which, in my opinion, it did commit under this count, but merely note my dissent.